# DECISIONS

OF THE

## SUPREME JUDICIAL COURT

OF ·

## MASSACHUSETTS

---

GEORGE P. KATTAR & others[1] vs. TELEMACHUS A.
DEMOULAS & others.[2]

Essex. September 11, 2000. - December 8, 2000.

Present: MARSHALL, C.J., ABRAMS, GREANEY, IRELAND, SPINA, & SOSMAN, JJ.

*Mortgage,* Foreclosure. *Practice, Civil,* Judgment notwithstanding verdict,
Special questions to jury, Findings by judge, Directed verdict. *Contract,*
Modification, Consideration. *Consumer Protection Act,* Unfair or deceptive
act, Damages, Vicarious liability. *Damages,* Consumer protection case.
*Jurisdiction,* Equitable.

At the trial of a claim for wrongful foreclosure, the judge properly submitted
the question of the parties' modification of the terms of the mortgage note

---

[1]Kevin P. Kattar, James M. Kattar, Kimberley Kattar, Meredith Kattar, Candace Kattar, Merrimack Golf Club Realty Trust, and Merrimack Golf Club Realty Trust Associates.

[2]Arthur T. Demoulas; Frances D. Kettenbach; Glorianne D. Farnham; Caren D. Pasquale; 231 Realty Trust Associates; NNA Associates; L.B. Group; Patricia J. Gilmore, trustee of the Skard Realty Trust; and Michael L. Kettenbach.

by a subsequent oral agreement, and the jury were warranted in finding
that the plaintiffs were not in breach of the modified contract. [8-10]

Where, at the trial of a claim for wrongful foreclosure, the issue of the par-
ties' modification of the provision to pay taxes on the mortgaged property
was a focal point in the case, argued by the parties, and the subject of
instruction to the jury, the judge had no authority under Mass. R. Civ. P.
49 (a) to make findings on the issue on a motion for judgment notwithstand-
ing the verdict, as it was submitted for the jury's determination and not
omitted. [10-12]

In a civil action, judgment notwithstanding the verdict as to two special ques-
tions submitted to the jury was inappropriate, as the jury's responses,
regarding G. L. c. 93A claims, were merely advisory; the judgment was
vacated. [12]

At the trial of a claim alleging violation of G. L. c. 93A, for the defendant's
retributive foreclosure of a mortgage for the plaintiff's refusal to accede to
the defendant's request to testify in reckless disregard of the truth in the
defendant's favor in an unrelated civil action, the judge properly admitted
evidence of the defendant's motive for the jury's determination whether
the defendant's conduct, in the circumstances, was unfair. [12-14]

At the trial of a G. L. c. 93A claim arising out of the foreclosure of a mortgage,
the evidence was sufficient to support a finding that an individual defendant
knowingly aided and abetted the person who controlled the entity that held
the mortgage and that the individual acted in a business context, such that
liability under the statute was proper. [14-15]

In a civil action, the judge correctly held the individual defendants jointly and
severally liable for compensatory damages. [15]

In a claim for violation of G. L. c. 93A, arising out of the foreclosure of a
mortgage, the judge properly ordered one defendant, the principal actor, to
pay double damages for his wrongful conduct, and his conclusion that the
other two defendants' conduct did not warrant multiple damages was not
shown to be clearly erroneous. [15-16]

In a claim brought under G. L. c. 93A, there was no error in the judge's
declining to hold a culpable defendant's business partners vicariously
liable for the defendant's unlawful, nonpartnership conduct. [16-17]

In a claim under G. L. c. 93A, arising from the foreclosure of a mortgage, the
plaintiffs did not demonstrate that, in the circumstances, they were entitled
to a reconveyance of the property in addition to monetary damages. [17-18]

In a civil action, the judge properly directed a verdict in favor of one defendant
on the plaintiffs' claim of breach of an agreement to make a loan, where
the evidence did not demonstrate a binding agreement. [18]

CIVIL ACTION commenced in the Superior Court Department on
October 21, 1997.

The case was tried before *David M. Roseman,* J.

The Supreme Judicial Court granted an application for direct
appellate review.

*Rudolph F. Pierce (Lynne Alix Morrison* with him) for Arthur T. Demoulas & others.

*Gary R. Greenberg (Lawrence R. Kulig* with him) for the plaintiffs.

*Richard K. Donahue, Richard K. Donahue, Jr., & Andrea S. Barisano,* for Telemachus A. Demoulas & another, submitted a brief.

SPINA, J. The plaintiffs filed a civil action against the defendants, the centerpiece of which comprised common law and G. L. c. 93A claims of wrongful foreclosure. The jury found for the plaintiffs on the common law count in responses to special verdict questions, but the judge ordered judgment for the defendants notwithstanding the verdict. The judge made his own findings on the claim under G. L. c. 93A, § 11, and ordered judgment for the plaintiffs. He found that some defendants had brought about an otherwise lawful foreclosure for an unfair reason, and he assessed damages of $900,000 against them. He also found that defendant Telemachus Demoulas had acted knowingly or wilfully as to the c. 93A violation and ordered double damages against him. He denied the plaintiffs' request for declaratory judgment requesting reconveyance. The parties filed cross appeals. We granted the plaintiffs' application for direct appellate review.

The plaintiffs claim that the judge erred in (1) ordering judgment notwithstanding the verdict (judgment n.o.v.); (2) applying Mass. R. Civ. P. 49 (a), 365 Mass. 812 (1974), on the common law count to the question of a modification of the duty to pay real estate taxes, where the question had been decided by the jury; (3) refusing to grant equitable relief in the form of a reconveyance of property that was the object of a wrongful foreclosure; (4) refusing to hold the defendants severally liable for damages attributable to them; (5) failing to impose multiple damages against all defendants found to have violated c. 93A; (6) failing to find partners vicariously liable for the acts of a defendant who violated c. 93A; and (7) directing a verdict against the plaintiffs on their claim of breach of an agreement to loan $1 million. The defendants claim the judge erred in (1) submitting special questions regarding modifications of the note and mortgage to the jury, where the plaintiffs were in breach at the time of the alleged modifications; (2) admitting evidence of the defendants' motive for initiating an otherwise lawful foreclosure proceeding; (3) finding a c. 93A violation from

performance of a lawful act (foreclosure) for a wrongful reason; and (4) denying the defendant Michael Kettenbach's motion to dismiss. We vacate the judgments n.o.v. and reinstate the jury's verdict. We affirm the judgment in all other respects.

1. *Facts.* We summarize facts which the jury could have found and those that the judge did find, reserving other details for discussion of the issues. The plaintiffs owned three parcels of land: (1) a commercial parcel in Salem, New Hampshire, that they leased to the Demoulas supermarket chain; (2) the Merrimack Valley Golf Club in Methuen, Massachusetts; and (3) an adjacent 163-acre undeveloped parcel known as Eastgate. The plaintiffs were eager to develop Eastgate, and asked the defendant, Telemachus Demoulas (Demoulas), in November, 1987, for a $2 million loan. Demoulas arranged the loan through his brother-in-law, who then assigned the note to a family business over which Demoulas had at least de facto control.

The loan, consummated on December 31, 1987, was evidenced by a two-year note secured by a mortgage on the golf course and Eastgate. The note incorporated by reference the terms and conditions of the mortgage. The mortgage was on the Statutory Condition. See G. L. c. 183, § 20. As such, the plaintiffs were required to pay the real estate taxes levied against the mortgaged premises. See *id.* In early November, 1989, before the note became due and without having made any real estate tax payments in two years, the plaintiffs approached Demoulas about extending the due date of the note and exploring options for payment of the taxes. In late November, 1989, Demoulas orally agreed to extend the due date of the note until Eastgate either was sold or developed. The plaintiffs agreed to continue to use their best efforts to develop Eastgate, including the expenditure of money for engineering services. They also gave Demoulas the power to reject any offers to purchase Eastgate. Demoulas orally agreed to pay the real estate taxes. The mortgage provides that any amounts thus paid would be added to the principal due under the note. The note and mortgage then went through a series of assignments among Demoulas-controlled entities, the last of which was on September 13, 1993, to Patricia J. Gilmore, trustee of the Skard Realty Trust.

During this time, a rift developed within the Demoulas family, culminating in three separate lawsuits. In the first suit Evanthea Demoulas, wife of the late George Demoulas, alleged

that Demoulas committed fraud in connection with his management of the supermarket chain. See *Demoulas* v. *Demoulas*, 428 Mass. 555 (1998). Arthur S. Demoulas, son of Evanthea and George Demoulas, brought the second suit, a derivative action, alleging a pattern of fraud by Demoulas which divested George Demoulas's family of its ownership interest in the family business. See *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 543 (1998). The third lawsuit, filed in 1995 by defendant Kettenbach, Demoulas's son-in-law, against Arthur S. Demoulas in the United States District Court for the District of Massachusetts, alleged that Arthur S. Demoulas had caused electronic eavesdropping devices to be illegally placed at Demoulas corporate headquarters and at Kettenbach's offices in the fall of 1990. See *Kettenbach* v. *Demoulas*, 901 F. Supp. 486 (D. Mass. 1995).

In the spring of 1993, Phil Scuderi, Demoulas's personal advisor, acting as Demoulas's agent, tried to enlist plaintiff Kevin Kattar (Kattar) to testify in Federal court that Arthur S. Demoulas paid him to "bug" the Demoulas headquarters, without knowing whether such testimony was true and with reckless disregard for whether it was true, in order to establish a defense to the fraud cases. He said they would tear up the note if Kattar did as they suggested. Kattar refused.

In October, 1993, the Skard Realty Trust brought suit to foreclose the plaintiffs' equity of redemption. The plaintiffs were told that the foreclosure would be "friendly." The parties agreed that the golf course would be reconveyed to the plaintiffs on full payment of the indebtedness that remained after the sale of Eastgate. At a meeting on April 12, 1994, at which Phil Scuderi, Joe McCain (Demoulas's private investigator), Demoulas's attorney (who also represented Kettenbach in the second eavesdropping case), Kettenbach, and Kattar were present, Kattar again was offered forgiveness of the plaintiffs' debt if he would testify that he "bugged" the Demoulas and Kettenbach offices at the request of Arthur S. Demoulas. Kattar refused, and denied any involvement in the eavesdropping. The judge found that Demoulas; his son, Arthur T. Demoulas; and Kettenbach encouraged such testimony in reckless disregard of the truth.[3] The foreclosure sale took place on April 21, and Demoulas, the sole bidder, bid $3.1 million. The property was transferred to

---

[3]In response to special question seven, which was advisory to the c. 93A claim, the jury found that the defendants caused the foreclosure to induce

another Demoulas-related entity, NNA Associates. The Kattars remained in possession of the golf course and presently operate it.

The first eavesdropping trial commenced in the summer of 1994. Kattar was subpoenaed by Kettenbach's attorney, but was released after telling counsel that he had nothing to do with the eavesdropping and would not testify that he did. Arthur S. Demoulas prevailed at that trial. In late 1996, a new trial was ordered in the eavesdropping case. At that time, the plaintiffs learned that Demoulas and a third party had entered into a purchase and sale agreement regarding Eastgate for $3.2 million. That third party had offered to buy Eastgate from the plaintiffs in November, 1992, for $4.6 million, but the plaintiffs rejected his offer at Demoulas's request. The plaintiffs had expected the proceeds of the sale would be sufficient to discharge their indebtedness, that they would receive the excess proceeds, and that the golf course would be reconveyed. Instead, Demoulas notified them that the rent they were then paying to operate the golf course would be increased from $20,000 to $30,000 per month and applied to their debt. This action followed.

The judge instructed the jury to return a special verdict on eleven questions, grouped by topic. Part I (special questions one through three) related to the issue of modification of the note.[4] Part II (special questions four through six) addressed the oral agreement at the time of foreclosure to reconvey the golf course. Part III (special questions seven through eleven) contained advisory questions as to the c. 93A claim. The judge reserved determination of the c. 93A claim for himself.

The jury found (1) that the parties agreed to a modification of

Kevin Kattar to testify that he "bugged" or assisted in "bugging," believing such testimony was false.

[4]Part I provides: Question One: "Did the defendants, Telemachus Demoulas and Arthur T. Demoulas (on behalf of themselves, Frances Demoulas Kettenbach, Glorianne Demoulas Farnham, Caren Demoulas Pasquale, and 231 Realty Trust Associates) enter into an oral agreement to extend the due date of the note given to Costas G. Psoinos dated November 23, 1987, until such time as Eastgate either was sold or developed by the Kattars or their entities?"

Question Two: "If your answer to Question 1 is yes, did such defendants breach such oral agreement by foreclosing the mortgage originally given to Costas G. Psoinos dated November 23, 1987 on the golf course and Eastgate?"

Question Three: "If your answers to Questions 1 and 2 are yes, what sum of money will fairly and adequately compensate the plaintiffs for such breach?"

the due date of the note; (2) that the defendants breached that agreement by foreclosing; (3) and that the plaintiffs incurred damages of $1.4 million. The jury also determined that there was an agreement to reconvey the golf course to the plaintiffs, but that such reconveyance was premised on full payment of the note. In response to special questions seven and eight, which were advisory to the c. 93A claim, the jury answered that the defendants foreclosed on the mortgage in an attempt to induce Kattar to testify falsely, that they acted knowingly or wilfully, and that the plaintiffs incurred damages of $4.9 million.

After the jury returned their special verdicts, the judge announced his findings on the c. 93A claim. He found that defendants Demoulas, Arthur T. Demoulas, and Kettenbach violated c. 93A because they foreclosed on the mortgage as retribution for Kattar's refusal to testify. He found that these defendants urged Kattar to testify on their behalf in reckless disregard of the truth. He assessed damages of $900,000, calculated as the difference between the fair market value of the mortgaged premises (Eastgate — $3.2 million, and the golf course — $1.7 million) and the total indebtedness ($4 million) at the time of the foreclosure. Judgment in the amount of $900,000 was entered against the three defendants severally. The judge further found that Demoulas acted knowingly or wilfully, and imposed double damages. On the defendants' posttrial motion to correct the calculation of the final judgment, the judge remitted the $900,000 damages from several liability to joint and several liability. The plaintiffs' request for reconveyance of the golf course was denied.

The defendants filed motions for judgment n.o.v. The judge ruled that the question of a modification of the obligation to pay real estate taxes was an "omitted question," and therefore he would supply the necessary finding under authority of Mass. R. Civ. P. 49 (a). He reasoned that, although the jury were entitled to conclude on the basis of special question one that there was an oral modification of the due date of the note, they made no finding under special question one that the parties had modified any other term or covenant in the note and mortgage. He proceeded to find that the parties had not agreed to a modification of the obligation to pay taxes, and ruled that the defendants were entitled to foreclose because the plaintiffs were in breach of the terms of their mortgage. The judge then ordered judgment n.o.v. as to special questions two and three. He also ruled,

citing *Colonial Operating Co.* v. *Poorvu*, 306 Mass. 104, 107 (1940), that, because the defendants were entitled to foreclose, their motive in doing so was irrelevant to the plaintiffs' breach of contract claim. Judgment n.o.v. also entered as to special questions seven and eight.

2. *Denial of judgment n.o.v. on special question one.* The defendants argue that the judge erred in submitting special question one, which pertained to modification of the due date of the note, because it was undisputed that at the time of the alleged modification the plaintiffs had not paid the real estate taxes and therefore were in breach. They further argue that, even if the note could be modified after a breach, it was not supported by consideration. We view the defendants' discussion at the charge conference to be an objection to the question. This issue was first raised in the defendants' motion for directed verdict and subsequently in their motion for judgment n.o.v. Mass. R. Civ. P. 50 (a), 365 Mass. 814 (1974). Mass. R. Civ. P. 50 (b), 428 Mass. 1402 (1998). The distilled issue, the sufficiency of the evidence on special question one, has been preserved for review.[5] See *Martin* v. *Hall*, 369 Mass. 882 (1976).

The defendants rely on *Hastings* v. *Lovejoy*, 140 Mass. 261 (1885), for the proposition that an agreement may be modified only before a breach occurs. The "rule" for which the case has been cited, however, is that "ordinarily a written contract, before breach, may be varied by a subsequent oral agreement, made on a sufficient consideration." *Id.* at 264. That case suggests that the "rule" is not fixed, and that if parties intend to modify their contract and actually change their positions such that the original contract cannot be enforced without working a fraud or an injustice on one party, there is sufficient new consideration to support an enforceable agreement.[6] See *Munroe* v. *Perkins*, 9 Pick. 298, 304 (1830).

---

[5]When reviewing a judgment n.o.v., we apply the same standard as the motion judge, "taking into account all the evidence in its aspect most favorable to the plaintiff, to determine whether, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, the jury reasonably could return a verdict for the plaintiff." *Tosti* v. *Ayik*, 394 Mass. 482, 494 (1985). Furthermore, we consider whether "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn" in favor of the nonmoving party. *Poirier* v. *Plymouth*, 374 Mass. 206, 212 (1978).

[6]We acknowledge a dearth of cases in this area, but there are recognized means by which parties have renegotiated terms of a contract after a breach

There was evidence from which the jury could have found that the parties agreed to an extension of the due date of the note until Eastgate either was sold or developed. It was also understood that Demoulas would pay the taxes and the principal amount due under the note would be increased by the amount paid. The plaintiffs agreed to expend additional money and use their best efforts to develop the Eastgate property. This would likely enhance the value of the collateral and inure to the benefit of Demoulas. They also gave Demoulas the power to reject any offer to purchase Eastgate, which he exercised. Cf. *Kahn* v.

has occurred. One such means is an "accord executory." An accord is "an agreement for the future discharge of an existing claim by a substituted performance." 6 A. Corbin, Contracts § 1268 (1962). The accord must be supported by new consideration. See *Emerson* v. *Deming*, 304 Mass. 478 (1939). Thus, when there has been a breach of contract, the contracting parties can agree to discharge the rights arising out of the breach and agree to some substituted performance.

Ordinarily, the accord alone does not discharge the underlying rights and remedies. Rather, the rights are suspended until such time as performance occurs. 6 A. Corbin, Contracts § 1274. When this executory contract is fully performed, "there is said to be an accord and satisfaction, and the previously existing claim is discharged." *Id.* at § 1276. See *Alden* v. *Thurber*, 149 Mass. 271, 275 (1889). Parties may agree that an accord itself shall be the satisfaction of the old right and, therefore, if the claimant accepts a promise with that agreement, his original claim is at once extinguished. 15 S. Williston, Contracts § 1846 (3d ed. 1972). R.W. Bishop, Prima Facie Case § 2.45 (4th ed. 1997). Thus, the accord itself can also be the satisfaction and therefore discharge the original contractual rights and remedies. See *Winston Bros.* v. *United States*, 130 F. Supp. 374 (Ct. Cl. 1955). See also *Champlin* v. *Jackson*, 313 Mass. 487 (1943) (noting accord and satisfaction is question of fact for jury).

Another area where postbreach renegotiation of terms commonly occurs is in the bankruptcy context. The threat of bankruptcy often motivates lenders to modify existing mortgages with defaulting debtors. Loan modification agreements materially change the terms of the original note or mortgage by, for example, extending the final due date on a note or providing for additional funds to cover a tax arrearage, and may be supported by additional consideration such as higher interest rates or waivers of rights that the debtor would otherwise have in the event it files for bankruptcy. See, e.g., *In re Club Tower L.P.*, 138 B.R. 307, 308-309 (Bankr. N.D. Ga. 1991) (enforcing prepetition waiver of debtor's right to oppose lender's motion for relief from the automatic stay under § 362[d] of the Bankruptcy Code that parties had included in amendment to loan agreement negotiated postdefault). See also *In re Riley*, 188 B.R. 191, 192 (Bankr. D.S.C. 1995) ("Generally, forbearance agreements [postdefault, prebankruptcy modifications of loan agreements] are enforceable when the parties have used the contract to afford a mortgagor the opportunity to avoid foreclosure").

*Waldman*, 283 Mass. 391, 394 (1933) ("Although the term of forbearance was not set by the parties, an agreement to forebear followed by actual forbearance for a reasonable time constituted sufficient consideration for the defendant's promise"). Demoulas implicitly waived his right to foreclose for the existing default.

Consideration for that agreement was both adequate and new. See *Melotte* v. *Tucci*, 319 Mass. 490, 491 (1946). The plaintiffs adhered to their promise for over four years, expending monies for engineering services and obtaining municipal permits. The plaintiffs also rejected an offer to sell Eastgate, at Demoulas's request. It would have been unjust to permit the defendants to benefit from four years of such efforts and violate their agreement not to foreclose. There was also consideration in Demoulas's waiver of his right to foreclose for the existing default.

The judge properly submitted the question of "modification" of the note to the jury. The jury was warranted in finding that the plaintiffs were not in breach of the modified contract, and as such were entitled to maintain this action. See *Mirachnick* v. *Kaplan*, 294 Mass. 208, 209 (1936).

3. *Application of rule 49 (a) to special questions two and three*. The plaintiffs argue that, because the issue of a modification of the obligation to pay real estate taxes was submitted to the jury, it was error for the judge to conclude that it was an omitted issue, and then to make his own independent findings on the matter from which he ordered judgment n.o.v.

Rule 49 (a) permits a judge to require a jury to return a special verdict by answering written questions on each issue of fact. If an issue is omitted and a party has neither requested that it be submitted to the jury nor objected to the judge's failure to submit the issue, the right to the jury's determination is deemed waived and the judge may make findings on the omitted issue. See *Hawco* v. *Massachusetts Bay Transp. Auth.*, 398 Mass. 1006, 1006 (1986).

The issue of a modification of the obligation to pay taxes was a focal point of the case. For reasons discussed in Part 1, *supra*, it was an integral part of the agreement to modify the due date of the note, and was the primary basis for that agreement. Counsel for the plaintiffs argued the point in his closing, maintaining that the defendants "excused" or "waived" the late payment of taxes and that the plaintiffs, therefore, were not in breach of their obligations under the note and mortgage.

Similarly, the issue was central to the defense. Counsel stated in his opening that it was up to the jury to determine whether the defendants had waived the tax obligation. This theme reverberated throughout the defendants' case, culminating in counsel's closing argument. Finally, on special questions two and three the judge instructed the jury that, "[i]n order to prevail on their breach of contract[7] claims here, [the] plaintiffs must prove four elements by a preponderance of the evidence . . . . Number two, that the plaintiffs performed *all* of their obligations under the contract or were excused from such performance by the other parties to the contract"[8] (emphasis added). Those instructions unequivocally required the jury to find that the plaintiffs, who indisputably had not paid the taxes, were *not* in breach of their obligation to pay the taxes before they could find that the defendants wrongfully foreclosed. The jury could not have found for the plaintiffs on special question two without first finding that the plaintiffs were not in default of their obligations under both the note and the mortgage. See *Melotte* v. *Tucci, supra.* The defendants were not prejudiced because the judge instructed the jury essentially as they had requested, and the issue was fully argued to the jury. See *Jacobs* v. *Pine Manor College*, 399 Mass. 411, 414 (1987), quoting *Campbell* v. *Shea*, 332 Mass. 422, 425 (1955) (stating that judge need not instruct jury using exact words proposed by parties, as long as "the subject matter thereof [was] dealt with adequately in the charge"). In these circumstances, the judge erred in ruling that the issue of modification of the tax obligation was omitted for purposes of rule 49 (a). Because the judge was without authority to make the finding that there was no such agreement, his order for judgment n.o.v. on special questions two and three must be vacated and the jury's verdict on those questions reinstated.

The defendants are not entitled to judgment n.o.v. on special question two in any event because they never raised the issue of modification of the tax obligation in their motion for directed verdict or in their motion for judgment n.o.v. Mass. R. Civ. P.

---

[7]It is well established that a mortgage and note are to be read together. See *Mayo* v. *Fitchburg & Leominster St. Ry.*, 269 Mass. 118, 121 (1929). Thus, a note coupled with its security, i.e., the mortgage, constitute one contract for breach of contract purposes.

[8]By so instructing the jury the judge effectively reversed his earlier ruling in which he said he intended to "save as much jury deliberation as possible" by reserving to himself whether nonpayment of taxes constituted a breach.

50 (b). See *Bonofiglio* v. *Commercial Union Ins. Co.*, 411 Mass. 31, 34 (1991), *S.C.*, 412 Mass. 612 (1992).

4. *Judgment n.o.v. on special questions seven and eight.* The plaintiffs next argue that the judge erred by ordering judgment n.o.v. as to special questions seven and eight on grounds not raised by the defendants in their motion for directed verdict. Mass. R. Civ. P. 50 (b). See *Bonofiglio* v. *Commercial Union Ins. Co., supra.*

Special questions seven and eight were not submitted on a common law count. They were advisory and nonbinding as to the G. L. c. 93A claims, which the judge reserved for himself. See *Linkage Corp.* v. *Trustees of Boston Univ.*, 425 Mass. 1, 22 n.31, cert. denied, 522 U.S. 1015 (1997); *Acushnet Fed. Credit Union* v. *Roderick*, 26 Mass. App. Ct. 604, 607 (1988). While a judge may request a jury's advisory opinion, he is not bound by it. *Id.* at 608. It is indeed both possible and feasible for a judge deciding a c. 93A claim to make findings of fact that are contrary to those made by a jury on a parallel common law claim, as here. See *Poly* v. *Moylan*, 423 Mass. 141, 151 (1996), cert. denied, 519 U.S. 1114 (1997); *Walsh* v. *Chestnut Hill Bank & Trust Co.*, 414 Mass 283, 287-288 (1993). Because the jury's responses to those questions were merely advisory, there was no verdict to set aside under rule 50 (b). The order for judgment n.o.v. as to special questions seven and eight could have no purpose and therefore should be vacated. The jury's answers stand as advisory.

5. *Motive and c. 93A.* The defendants claim that the judge erred in admitting evidence on the c. 93A claim as to the defendants' motive for the foreclosure. They contend that, because evidence of motive is irrelevant to a common law claim of wrongful foreclosure, see *Colonial Operating Co.* v. *Poorvu*, 306 Mass. 104 (1940), it should also be irrelevant to a claim under c. 93A involving a foreclosure.

Chapter 93A is "a statute of broad impact which creates new substantive rights and provides new procedural devices for the enforcement of those rights." *Slaney* v. *Westwood Auto, Inc.*, 366 Mass. 688, 693 (1975). The relief available under c. 93A is "sui generis. It is neither wholly tortious nor wholly contractual in nature, and is not subject to the traditional limitations of preexisting causes of action." *Id.* at 704. It "mak[es] conduct unlawful which was not unlawful under the common law or any prior statute." *Commonwealth* v. *DeCotis*, 366 Mass. 234, 244

n.8 (1974). Thus, a cause of action under c. 93A is "not dependent on traditional tort or contract law concepts for its definition." *Heller* v. *Silverbranch Constr. Corp.*, 376 Mass. 621, 626 (1978). See *Nei* v. *Burley*, 388 Mass. 307, 313 (1983) ("[A]nalogies between common law claims for breach of contract, fraud, or deceit and claims under c. 93A are inappropriate because c. 93A dispenses with the need to prove many of the essential elements of those common law claims").

The defendants' conduct occasioning foreclosure as retribution for Kattar's refusal to testify qualifies as actionable conduct under § 11. This is simply a new case for an old proposition: where foreclosure of a mortgage, even on an actual default, is conducted in bad faith to the detriment of the mortgagor, an action will lie. See *Levin* v. *Reliance Co-op. Bank*, 301 Mass. 101, 103 (1938); *Morse* v. *Mutual Fed. Sav. & Loan Ass'n of Whitman*, 536 F. Supp. 1271 (D. Mass. 1982) (holding mortgagee's bringing foreclosure proceedings for ulterior purpose of collecting mortgagor's bad check indebtedness was wrongful and in violation of c. 93A). The motive evidence was relevant to the c. 93A claim and was thus properly admitted.

The defendants further argue that, as matter of law, it was not unfair or deceptive to ask Kattar to testify to what the defendants believed to be true. Their first obstacle is that the judge was not so generous in his findings: he found that they acted in reckless disregard of the truth of such testimony. But even if the defendants had asked Kattar to testify to something they honestly believed were true, that was not the gravamen of the c. 93A claim. The conduct that violated c. 93A was occasioning the foreclosure as retribution for Kattar's refusal to testify.

Their claim that there can be no c. 93A violation because they had a legal right to foreclose has no merit. Legality of underlying conduct is not necessarily a defense to a claim under c. 93A. See *Schubach* v. *Household Fin. Corp.*, 375 Mass. 133, 137 (1978). Chapter 93A does not define what constitutes an "unfair or deceptive act or practice." Such a definition would be impossible, because, as the Appeals Court aptly noted, "[t]here is no limit to human inventiveness in this field." *Levings* v. *Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 503 (1979), quoting H.R. Conf. Rep. No. 1142, 63d Cong., 2d Sess. (1914). Although G. L. c. 93A, § 2 (*b*), states that courts are to be guided by the Federal Trade Commission and Federal court interpretations of the Federal Trade Commission Act, *PMP*

*Assocs., Inc.* v. *Globe Newspaper Co.*, 366 Mass. 593, 595 (1975), unfair or deceptive conduct is best discerned "from the circumstances of each case." *Commonwealth* v. *DeCotis, supra* at 242. See *Kerlinsky* v. *Fidelity & Deposit Co.*, 690 F. Supp. 1112, 1119 (D. Mass. 1987), aff'd, 843 F.2d 1383 (1st Cir. 1988) ("[I]t is not the definition of an unfair act which controls but the context — the circumstances to which that single definition is applied"). Even if the defendants had the right to foreclose, as the judge found, it was clearly unfair, within the meaning of c. 93A, to use that right for a reason so obviously against public policy. Cf. *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 473, 476 (1991) (use of discretionary contract right to "forc[e] financial concessions" was unfair or deceptive act violating c. 93A).

6. *Michael Kettenbach's liability.* Kettenbach moved to dismiss the c. 93A claim on the ground that he had no position with, or authority from, the entity that held the note and mortgage and that ultimately foreclosed the plaintiffs' equity of redemption.

When reviewing the denial of a motion to dismiss, we are "guided by the principle that a complaint is sufficient 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Blank* v. *Chelmsford OB/GYN, P.C.*, 420 Mass. 404, 407 (1995), quoting *Nader* v. *Citron*, 372 Mass. 96, 98 (1977). The complaint stated a sufficient claim against Kettenbach, and the evidence at trial supported the claim. The judge found Kettenbach was present at the meeting on April 12, 1994, at which Kattar was asked to testify at the eavesdropping trial but refused because he had no involvement in the eavesdropping. After the meeting Kettenbach told his lawyer that Kattar was the "bugger." The fact that Kettenbach was not shown to have any formal authority or hold any interest in the entity that foreclosed the mortgage is not dispositive. There was evidence from which the judge could have inferred that Demoulas had actual control of the entity which held the mortgage, that Kettenbach was an integral member of Demoulas's inner business circle, and that Kettenbach knowingly aided and abetted Demoulas and others in the retributive measures taken against Kattar. The complaint adequately signaled this theory of liability.

Kettenbach also argues that the lack of privity between him and the Kattars precludes a c. 93A claim. Parties need not be in

privity for their actions to come within the reach of c. 93A. See *Burnham* v. *Mark IV Homes, Inc.*, 387 Mass. 575, 581 (1982) (buyer of modular home could sue manufacturer); *Maillet* v. *AFT-Davidson Co.*, 407 Mass. 185, 191 (1990) (injured printing press operator could maintain suit against manufacturer). We conclude that, based on the record presented, the evidence was sufficient to support a finding that Kettenbach knowingly acted in a business context and therefore was a proper defendant for c. 93A purposes. See *Kerlinsky* v. *Fidelity & Deposit Co.*, *supra.*

7. *Joint and several liability.* The plaintiffs claim that the judge erroneously held the defendants jointly and severally liable for compensatory damages. The judge had originally ordered that such liability be imposed severally, but amended the judgment on the defendants' posttrial motion.

The amended order is correct. A fundamental principle on which the rule of damages is based is compensation. Compensation is that amount of money that reasonably will make the injured party whole. Compensatory damages may not exceed this amount. Anything beyond that amount is a windfall. Cf. *Ficara* v. *Belleau*, 331 Mass. 80, 82 (1954) (contract); *Rodgers* v. *Boynton*, 315 Mass. 279, 280-281 (1943) (tort). General Laws c. 93A, consistent with this principle, states that "recovery shall be in the amount of actual damages." See G. L. c. 93A, §§ 9 (3) and 11, fifth par. Joint and several liability assures that plaintiffs properly will recover their actual damages only once. Several liability for actual damages would permit the plaintiffs to recover their actual damages three-fold, a result which is not permitted. Cf. *International Fid. Ins. Co.* v. *Wilson*, 387 Mass. 841, 859 (1983) (joint and several liability for actual damages; several liability for punitive damages).

8. *Multiple damages.* The judge found that Demoulas had wilfully violated G. L. c. 93A, § 11, and ordered that he pay multiple (double) damages because he was the principal actor. Those findings have support in the record. The plaintiffs contend that, because the judge found that Arthur T. Demoulas and Kettenbach had acted similarly toward Kattar, i.e., in reckless disregard of the truth of the testimony they were seeking from him, the judge was required to find that they, too, wilfully violated c. 93A and be subjected to multiple damages. We disagree.

Whether the defendants violated c. 93A in a wilful or knowing manner was a matter for the judge. *Raymer* v. *Bay State*

*Nat'l Bank*, 384 Mass. 310 (1981). We have said that a finding of "wilful" conduct within the meaning of c. 93A is satisfied where the defendant has acted recklessly. See *St. Paul Surplus Lines Ins. Co.* v. *Feingold & Feingold Ins. Agency, Inc.*, 427 Mass. 372, 377 (1998) (holding broker liable to insurer which issued policy based on material misinformation that broker with reckless disregard for truth placed on insurance application, where broker knew, or reasonably should have known, that disclosure of truth would have led insurer to reject application); *Briggs* v. *Carol Cars, Inc.*, 407 Mass. 391, 396-397 (1990) (concluding misrepresentation of condition of car with reckless disregard of truth or falsity of statement constituted wilful violation of c. 93A). We have also stated that the term "wilful" can be equated with reckless conduct. See *Still* v. *Commissioner of the Dep't of Employment & Training*, 423 Mass. 805, 812-813 (1996) ("[D]ecisions construing the multiple damages provisions of G. L. c. 93A [1994 ed.] have imposed such damages for 'wilful' or 'knowing' violations, equating the former with reckless conduct and the latter with intentional acts"). However, because evidence will support a particular finding does not require that the finding be made.

Ultimately, c. 93A ties liability for multiple damages to the degree of the defendant's culpability. See *International Fid. Ins. Co.* v. *Wilson, supra* at 853 (assessing damages based on "the egregiousness of each defendant's conduct"). Here, the judge found that the difference between the conduct of Demoulas, who was the mastermind, and the others was a matter of degree. His findings were based on his experience with the case in its entirety, and well within the range of his discretion. We cannot conclude that this finding was clearly erroneous. See *Clegg* v. *Butler*, 424 Mass. 413, 420 (1997) (determining that judge's c. 93A findings will not be disturbed unless clearly erroneous). There was no error.

9. *Vicarious liability under c. 93A.* The plaintiffs contend that the judge erred by declining to hold Arthur T. Demoulas's partners liable for his conduct that violated c. 93A. They rely on *Kansallis Fin. Ltd.* v. *Fern*, 421 Mass. 659 (1996), for the proposition that partners may be vicariously liable for the wrongful acts of a partner. The judge found that the c. 93A violation consisted of foreclosing in retribution for Kattar's refusal to testify. The foreclosure was not brought by Arthur T. Demoulas as partner or general partner, but by Patricia J.

Gilmore, trustee of Skard Realty Trust. Although the judge found that Arthur T. Demoulas was involved in the over-all scheme that violated G. L. c. 93A, § 11, it does not appear that he is a partner of Skard Realty Trust or that that entity is a partnership. The plaintiffs cite nothing in the record to the contrary. There was no error.

10. *Equitable relief: reconveyance of the golf course.* The judge declined to order reconveyance of the golf course under c. 93A. He determined that, given the circumstances as presented and the way in which he treated the c. 93A claims, monetary damages were more appropriate than equitable relief. The plaintiffs argue that the judge abused his discretion under c. 93A in not awarding the reconveyance because monetary damages do not adequately compensate them, and because the proper remedy for wrongful foreclosure is reconveyance of the property.[9]

General Laws c. 93A, § 11, empowers a judge to grant equitable relief. See *Commonwealth* v. *DeCotis*, 366 Mass. 234, 245 (1974) (stating c. 93A "granted full authority to the courts to use their traditional equity power to fashion decrees to remedy the wrong complained of and to make the decree effective"). As noted in Part 5, *supra*, c. 93A is sui generis and "created new substantive and procedural rights previously not available at common law." *Greenfield Country Estates Tenants Ass'n, Inc.* v. *Deep*, 423 Mass. 81, 88 (1996). See *York* v. *Sullivan*, 369 Mass. 157, 164 (1975), citing *Commonwealth* v. *DeCotis, supra* at 244 n.8 ("[I]t was not designed to limit their pre-existing rights and remedies, or to create obstacles to their pursuit"); *Slaney* v. *Westwood Auto, Inc.*, 366 Mass. 688, 704 (1975). Thus, c. 93A provides the possibility for broad, far-reaching equitable relief. We have no doubt that this includes the power to reconvey real estate. See, e.g., *Chace* v. *Morse*, 189 Mass. 559, 561 (1905). However, the circumstances here did not require a reconveyance.

The judge found that there was no modification of the tax obligation under the mortgage, and because the plaintiffs had not paid the taxes, Skard Realty Trust had the right to foreclose. He was also mindful that the jury had found, in response to special questions four, five, and six, that there was an agreement to reconvey the golf course on payment of the balance due

---

[9]The plaintiffs do not argue that equitable relief was available under the common law count. See *Chace* v. *Morse*, 189 Mass. 559, 561 (1905); *Rogers* v. *Barnes*, 169 Mass. 179 (1897). The issue is deemed waived.

under the note after Eastgate was sold, but that the plaintiffs had not been damaged because they failed to tender that payment. In the circumstances, the plaintiffs have failed to show that they were entitled to a reconveyance, or that the judge otherwise had abused his discretion. There was no error.

11. *Directed verdict as to $1 million loan.* The plaintiffs' final assignment of error is that the judge erred by directing a verdict as to an alleged 1990 agreement by Demoulas to loan the plaintiffs $1 million. The judge found that there was "absolutely no consideration . . . on the evidence that any rational mind could find that there was a commitment to loan the million dollars" and therefore there was no binding agreement by any of the defendants to commit to a loan.

When reviewing a directed verdict, we inquire whether anywhere, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the nonmoving party on each element of his claim. *McAvoy* v. *Shufrin*, 401 Mass. 593, 596 (1988).

The plaintiffs offered evidence that Demoulas promised to lend them $1 million to pay the real estate taxes on the mortgaged property in 1990 and to pay money owed the Internal Revenue Service. Demoulas had his lawyers prepare the loan documents and sent them to the plaintiffs. The documents were executed and returned to Demoulas, who refused to sign them. This case is governed by the principle stated in *Rhode Island Hosp. Trust Nat'l Bank* v. *Varadian*, 419 Mass. 841, 849-850 (1995). The promise here was not a promise in the contractual sense, but only an expression of a present intention. Reliance would have been commercially unreasonable. See *id.* at 850. There was no error.

12. *Summary.* The judgments n.o.v. on special questions two, three, seven, and eight are vacated, and the jury's verdict of $1.4 million on special question three is to be reinstated. The judge's award of $900,000 in actual damages under G. L. c. 93A is affirmed. That amount is duplicative of the jury's award of $1.4 million on special question three, so the higher figure will appear in the judgment. The judge's award of $900,000 in punitive damages against Telemachus Demoulas is affirmed. The judgment is affirmed in all other respects.

*So ordered.*